IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JEWEL FOOD STORES ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| INTERNATIONAL BROTHERHOOD OF ) | |
| TEAMSTERS, LOCAL 710 ) | Civil Action No.: 05 C 7299 |
| ) | |
| Defendant, ) | Suzanne B. Conlon, Judge |
| ) | |
| INTERNATIONAL BROTHERHOOD OF ) | |
| TEAMSTERS, LOCAL 710 ) | |
| ) | |
| Cross-Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| JEWEL FOOD STORES ) | |
| ) | |
| Cross-Defendant. ) | |
| ) | |

## MEMORANDUM OPINION AND ORDER

Jewel Food Stores ("Jewel") seeks to set aside an adverse labor arbitration decision pursuant to Section 301 of the Labor Management Relations Act ("LMRA"). 29 U.S.C. § 185. Defendant International Brotherhood of Teamsters, Local 710 ("the union") filed a cross-claim to enforce the arbitrator's decision. The parties cross-move for summary judgment. The union seeks sanctions against Jewel under Rule 11, attorneys' fees, and prejudgment interest.

### FACTS

The underlying facts are undisputed. The union represents many employees who work at Jewel's food distribution warehouse in Melrose Park, Illinois. A collective bargaining agreement

governs the parties' relationship, effective August 15, 2003 to August 1, 2007. The agreement contains a provision protecting union workers from layoffs due to subcontracting. The parties and their predecessors have been subject to similar provisions as part of various collective bargaining agreements since 1970. The subcontracting provision has been interpreted by arbitrators at least four times in 1971, 1992, 1995, and 2005.[1] The subcontracting provision is at the heart of this dispute.

As the last collective bargaining agreement neared expiration in August, 2003, the union obtained the right to strike. To prevent interruption of its operations, Jewel subcontracted the warehouse work to an employment agency. The employment agency began work on August 9, 2003. The parties reached a new agreement a few days later, avoiding a strike. However, Jewel continues to employ the agency to do some of the warehouse work, contending that the employment agency is more efficient than the union. As a result, some union members have not returned to work at the warehouse.

The union filed grievances pursuant to the terms of the collective bargaining agreement, protesting, *inter alia*, the continued subcontracting of warehouse work to the employment agency. An arbitration hearing was conducted pursuant to the bargaining agreement. The language at issue is Section 1.3 of the collective bargaining agreement:

> For the purpose of continuing to preserve work and earning opportunities of employees in the certified bargaining units represented by the Union, Jewel agrees that no work or services presently being performed by the employees in the certified collective bargaining units represented by the Union will be discontinued, subcontracted, transferred, leased, assigned, conveyed or farmed out in whole or in

---

[1] There is evidence of a fifth interpretation in the record. *See, e.g.*, Pl. Ex. 11 at 20 (mentioning the "Goldstein award"). However, it did not receive significant treatment from the parties.

part to other carriers or persons during the life of the Wage Agreement beginning April 1, 1998, and ending March 31, 2003, where such action will result in the layoff of any persons comprised within the groups for whom the Agreements now provide a guaranteed full month's equivalent of regular straight time work or pay.

The Employer agrees that all full-time employees on the Permanent Seniority Rosters as of June 30, 1973 shall be guaranteed a full month's equivalent of regular straight time work or pay in any month in which they work one (1) day or more. The aforementioned guarantee shall not apply to employees hired after June 30, 1973.

Pl. Ex. 11 at 2.

The arbitrator issued a comprehensive 27-page decision sustaining the union's grievance in part on October 7, 2005. She found that the 1971 arbitration award controlled, that Section 1.3 was ambiguous, and that extrinsic evidence established Jewel's continued subcontracting of bargaining unit work to an employment agency violated the provision. Jewel contests the award.

## ANALYSIS

"Judicial review of arbitration awards is tightly limited; perhaps it ought not be called 'review' at all." *Baravati v. Josephthal, Lyon & Ross, Inc.*, 28 F.3d 704, 706 (7th Cir. 1994). This court may not review the merits of the arbitrator's decision, despite allegations of interpretive errors. *Int'l Union of Operating Eng'rs, Local 139, AFL-CIO v. J.H. Findorff & Son, Inc.*, 393 F.3d 742, 745 (7th Cir. 2004). The arbitrator's decision must be upheld so long as it "draws its essence from the collective bargaining agreement" and does not represent the arbitrator's "own brand of industrial justice." *United Paper Workers Int'l Union et al. v. Misco*, 484 U.S. 29, 36 (1987) (quoting *Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 596 (1960)). The court's only inquiry is whether the arbitrator interpreted the contract, not whether the arbitrator erred – or even grossly erred – in her interpretation. *Int'l Union*, 393 F.3d at 745. Jewel cannot prevail unless it proves "there is no possible interpretive route to the

3

[arbitrator's] award, so a non-contractual basis can be inferred." *CUNA Mut. Ins. Soc'y v. Office and Prof'l Employees Int'l Union, Local 39*, __ F.3d __, 2006 WL 647717, at *5 (7th Cir. Mar. 16, 2006).

The arbitrator's interpretive route is evident. She found that the 1971 decision controlled. The 1971 decision was issued just a year after Section 1.3 was first included in the collective bargaining agreements in some form. Pl. Ex. 11 at 20. The 1971 arbitrator found that the language contained an ambiguity and examined the bargaining history of the parties to discern their intent. *Id.* at 21. After examining three related agreements, the 1971 arbitrator concluded that Section 1.3 protected all full time employees from loss of work due to subcontracting, including warehouse work. *Id.* at 21-22. The arbitrator found that the 1971 interpretation of contract terms became part of the parties' agreement unless the agreement was changed in relevant part. She concluded that despite amending Section 1.3 soon after the 1971 arbitration by adding the second paragraph to Section 1.3, the parties did not alter that provision to supercede the 1971 decision. *Id.* at 23-24. Therefore, the current Section 1.3 protected all full time employees from loss of work due to subcontracting. *Id.* at 25.

Jewel argues that the arbitrator's decision failed to interpret the terms of the contract because:

> (1) the Arbitrator refused to apply the contract's unambiguous language (language that two prior arbitrators found to be subject to only one meaning), (2) the Award indicates that the Arbitrator is concerned about the impact of the Agreement's language, (3) the Arbitrator relied on an inapposite 1971 award, and (4) the effect of the Arbitrator's award is overbroad.

Pl. Reply at 2. These alleged inadequacies in the arbitration decision do not support a conclusion that the arbitrator dispensed her own brand of industrial justice, as Jewel maintains.

4

The arbitrator agreed with the 1971 arbitration, finding that Section 1.3 was ambiguous. Jewel argues the arbitrator should have relied on two more recent arbitration decisions in 1992 and 1995, rather than the earlier award. However, "[e]ven if one arbitrator interpreted the agreement one way, and a different arbitrator interpreted the agreement another way, [this court] need not decide which interpretation is correct." *CUNA*, 2006 WL 647717, at *7. The arbitrator was at liberty to choose between relevant decisions so long as there was an interpretive reason for doing so. The arbitrator concluded that the 1971 decision was the most relevant because it was issued only one year after the language at issue first appeared in the parties' collective bargaining agreements. Pl. Ex. 11 at 20. The 1971 arbitrator heard evidence from people who negotiated the language instead of engaging in *post facto* interpretations. *Id.* at 23. Here, the arbitrator considered the 1992 and 1995 arbitrations, but found there was no evidence that the 1992 and 1995 decisions took the 1971 decision into consideration. *Id.* at 24. Neither the 1992 nor the 1995 award discussed or distinguished the 1971 decision considering the same language. *Id.* The arbitrator here also found that it was not clear that the work at issue in the 1992 and 1995 awards was sufficiently similar to the work involved in the current case to warrant analogy. *Id.* These interpretations of the relevant arbitration decisions and their effect on this case, whether correct or not, constitute a sufficient interpretive basis to sustain the award. *Int'l Union*, 393 F.3d at 745.

For the same reason, Jewel's argument that the arbitration award was overbroad must fail. The challenged award was dictated by the 1971 award. Pl. Ex. 11 at 25-26. The arbitrator had an interpretive basis for selecting the 1971 decision and applying its terms to this dispute, so the remedy required by the 1971 award must be upheld.

Jewel argues that the 1971 award is inapposite because the amendment to Section 1.3 in 1973 rendered the 1971 award inapplicable. The arbitrator considered this argument and rejected it:

> On its face, the new language had one significant purpose unrelated to subcontracting – to expand the work guarantee from a week to a full month for all employees employed as of the date of the Agreement. It also contains its own limitation – that any employees hired after that date would not receive a month's guarantee. The language added does not state that it was intended to limit the protection against layoff from subcontracting as well.

Pl. Ex. 11 at 23. This interpretation of the 1973 amendment to Section 1.3 is based on the collective bargaining agreement. Like reliance on the 1971 arbitration, the arbitrator's award must be sustained whether correct or not.

Jewel argues that the arbitrator's concern for the impact of the contract's plain language indicates she refused to interpret the contract. Specifically, the arbitrator found:

> On the basis of all the evidence[,] the Arbitrator cannot conclude that the parties agreed to change the interpretation of the subcontracting language rendered by the [1971] award. The nature of the change would be significant – from protecting against layoff 100% of full-time regular employees under the [1971] award to protecting less than 10% of them now.

Pl. Ex. 11 at 25. Jewel contends that this statement suggests the arbitrator did not like the result of applying the plain meaning of the contract, so she found that the provision was ambiguous in order to reach a different result. This conclusion is unwarranted. The result of Jewel's reading of the agreement only illustrates the arbitrator's point. If the 1971 award so drastically misrepresented the parties' intentions, the parties could have changed the language of Section 1.3 to accurately reflect their intent. *Id.* However, the parties did not change the language. Consequently, the arbitrator refused to adopt a reading drastically contrary to the 1971 award. *Id.*

6

Furthermore, the arbitrator's reliance on extrinsic evidence was proper because she found the agreement ambiguous. *Jasper Cabinet v. United Steelworkers*, 77 F.3d 1025, 1031 (7th Cir. 1996). Evidence of the parties' past practices or the "law of the shop" may be considered. *Id.* at 1030; *CUNA*, 393 F.3d at 746.

In its summary judgment motion, the union requests sanctions pursuant to Fed. R. Civ. P. 11. Rule 11 explicitly provides that a motion for sanctions shall be made separately from other motions or requests. Fed. R. Civ. P. 11(c)(1)(A). Thus, the union's request for Rule 11 sanctions may not be considered. *Corley v. Rosewood Care Ctr., Inc.*, 142 F.3d 1041, 1058 (7th Cir. 1998); *Magin v. Monsanto Co.*, 2005 WL 83334, at *6 (N.D. Ill. Jan. 13, 2005) (Holderman, J.).

The union moves for attorneys' fees. While the LMRA does not provide for attorneys' fees or costs, a losing party in a labor arbitration case may be required to pay fees and costs when its arguments are frivolous or vexatious. *Alberici-Eby v. Local 520, Int'l Union of Operating Eng'rs*, 992 F.2d 727, 734 (7th Cir. 1993); *United Airlines, Inc. v. Ewers*, 2002 WL 1905354, at *7 (N.D. Ill. Aug. 19, 2002) (Grady, J.). Arguments are frivolous when made "in bad faith – brought to harass rather than to win." *Local 879, Allied Indus. Workers of Am. v. Chrysler Marine Corp.*, 819 F.2d 786, 791 (7th Cir. 1987); *United Airlines*, 2002 WL 1905354, at *7. While this court finds Jewel's arguments unpersuasive, it cannot fairly conclude that Jewel has engaged in frivolous or vexatious conduct. Jewel relied on two arguably conflicting decisions made by different arbitrators in an effort to vacate the present award. An award of attorneys' fees is unwarranted.

The union also asks for prejudgment interest. Prejudgment interest awards in an LMRA action are discretionary. *Int'l Ass'n of Bridge, Structural & Ornamental Iron Workers, Local Union No. 103 v. Higdon Constr. Co.*, 739 F.2d 280, 283 (7th Cir. 1984). The union argues that prejudgment interest on the back pay awards to Jewel's laid off employees is necessary in order to make them whole and to prevent Jewel from gaining a windfall by retaining use of their back pay awards for the period of time Jewel has improperly refused to comply with the arbitrator's decision. Jewel does not oppose this request. Therefore, prejudgment interest is awarded from the date of the October 7, 2005 award until the present judgment.

## CONCLUSION

The union's motion for summary judgment is granted; the October 7, 2005 arbitration award of back pay to laid off Jewel employees and other relief stands. In addition, prejudgment interest is awarded from October 7, 2005 until entry of this judgment. Jewel's motion for summary judgment is denied.

ENTER:

*Suzanne B. Conlon*

Suzanne B. Conlon

April 21, 2006    United States District Judge